

1  PHILLIP A. TALBERT
   United States Attorney
2  ANDRÉ M. ESPINOSA
   ROSANNE RUST
3  Assistant United States Attorneys
   501 I Street, Suite 10-100
4  Sacramento, CA 95814
   Telephone: (916) 554-2700
5
   Attorneys for Plaintiff
6  United States of America

7                  IN THE UNITED STATES DISTRICT COURT

8                  EASTERN DISTRICT OF CALIFORNIA

9

10  UNITED STATES OF AMERICA,            CASE NOS.  15-CR-00176-TLN
                                                    15-CR-00242-TLN-SKO
11                       Plaintiff,
                                        PLEA AGREEMENT
12            v.
                                        DATE:    MARCH 30, 2017
13  MEGHAN PARADIS,                      TIME:    9:30A.M.
                                        COURT:   Hon. TROY L. NUNLEY
14                       Defendant.

15

16                       I.      **INTRODUCTION**

17  **A.    Scope of Agreement.**

18        The defendant is charged in Indictment, 15-CR-00176-TLN, with violations of 18 U.S.C. §

19  1029(b)(2) – Conspiracy to Commit Access Device Fraud ("Count One"); and 18 U.S.C. § 1029(a)(2) –

20  Use of Unauthorized Access Devices ("Count Six").  The defendant is also charged in Indictments, 15-

21  CR-00242-TLN-SKO, with violations of 18 U.S.C. § 371 – Conspiracy to Destroy Letter Boxes and

22  Steal Mail Matter ("Count One"); 18 U.S.C. § 1705 – Destruction of Letter Boxes ("Counts Two and

23  Three"); and 18 U.S.C. § 1708 – Theft of Mail Matter ("Counts Four and Five").  Both Indictments

24  contain forfeiture allegations.  This document contains the complete plea agreement between the United

25  States Attorney's Office for the Eastern District of California (the "government") and the defendant

26  regarding the charges against the defendant in both cases.  This plea agreement is limited to the United

27  States Attorney's Office for the Eastern District of California and cannot bind any other federal, state, or

28  local prosecuting, administrative, or regulatory authorities.

    PLEA AGREEMENT                        1

**B.**     **Court Not a Party.**

The Court is not a party to this plea agreement.  Sentencing is a matter solely within the discretion of the Court, and the Court may take into consideration any and all facts and circumstances concerning the criminal activities of defendant, including activities which may not have been charged in the Indictments.  The Court is under no obligation to accept any recommendations made by the government, and the Court may in its discretion impose any sentence it deems appropriate up to and including the statutory maximum stated in this plea agreement.

If the Court should impose any sentence up to the maximum established by the statute, the defendant cannot, for that reason alone, withdraw her guilty plea, and she will remain bound to fulfill all of the obligations under this plea agreement.  The defendant understands that neither the prosecutor, defense counsel, nor the Court can make a binding prediction or promise regarding the sentence she will receive.

## II.     DEFENDANT'S OBLIGATIONS

**A.**     **Guilty Plea.**

The defendant will plead guilty to violations of: 18 U.S.C. § 1029(b)(2) – Conspiracy to Commit Access Device Fraud ("Count One"), as charged in Indictment, 15-CR-00176-TLN; and 18 U.S.C. § 1708 – Theft of Mail Matter ("Count Five"), as charged in Indictment, 15-CR-00242-TLN-SKO.  The defendant agrees that she is in fact guilty of these charges and that the facts set forth in the Factual Basis for Plea attached hereto as Exhibit A are accurate.

The defendant agrees that this plea agreement will be filed with the Court and become a part of the record of the case.  The defendant understands and agrees that he will not be allowed to withdraw her pleas should the Court not follow the government's sentencing recommendations.

The defendant agrees that the statements made by her in signing this Agreement, including the factual admissions set forth in the factual basis, shall be admissible and useable against the defendant by the United States in any subsequent criminal or civil proceedings, even if the defendant fails to enter a guilty plea pursuant to this Agreement.  The defendant waives any rights under Fed. R. Crim. P. 11(f) and Fed. R. Evid. 410, to the extent that these rules are inconsistent with this paragraph or with this Agreement generally.

PLEA AGREEMENT                        2

**B.      Restitution.**

The Mandatory Victim Restitution Act requires the Court to order restitution to the victims of certain offenses.  Defendant agrees that her conduct is governed by the Mandatory Restitution Act pursuant to 18 U.S.C. § 3663A(c)(1)(A)(ii) and agrees to pay the full amount of restitution to all victims affected by these offenses, including, but not limited to, the victims covered in the factual basis, victims covered in those counts to be dismissed as part of the plea agreement pursuant to 18 U.S.C. § 3663A(a)(3), and other victims as a result of the defendant's conduct for the offenses charged from the periods of September 2013 through September 14, 2014.  The amount of restitution will be between approximately $175,000 and $215,000.

Defendant further agrees that she will not seek to discharge any restitution obligation or any part of such obligation in any bankruptcy proceeding.

Payment of restitution shall be by cashier's or certified check made payable to the Clerk of the Court.

**C.      Fine.**

The defendant agrees to pay a criminal fine as ordered by the Court at sentencing.  If the Court imposes a fine, the defendant agrees to pay such fine if and as ordered by the Court, up to the statutory maximum fine for the defendant's offenses.

**D.      Special Assessment.**

The defendant agrees to pay a special assessment of $200 at the time of sentencing (comprised of $100 per count to which the defendant is pleading guilty) by delivering a check or money order payable to the United States District Court to the United States Probation Office immediately before the sentencing hearing.  The defendant understands that this plea agreement is voidable at the option of the government if she fails to pay the assessment prior to that hearing.  If the defendant is unable to pay the special assessment at the time of sentencing, she agrees to earn the money to pay the assessment, if necessary by participating in the Inmate Financial Responsibility Program.

**E.      Violation of Plea Agreement by Defendant/Withdrawal of Pleas.**

If the defendant violates this plea agreement in any way, withdraws her plea, or tries to withdraw her plea, this plea agreement is voidable at the option of the government.  If the government elects to

1   void the agreement based on the defendant's violation, the government will no longer be bound by its
2   representations to the defendant concerning the limits on criminal prosecution and sentencing as set
3   forth herein. A defendant violates the plea agreement by committing any crime or providing or
4   procuring any statement or testimony which is knowingly false, misleading, or materially incomplete in
5   any litigation or sentencing process in this case, or engages in any post-plea conduct constituting
6   obstruction of justice. Varying from stipulated Guidelines application or agreements regarding
7   arguments as to 18 United States Code section 3553, as set forth in this agreement, personally or through
8   counsel, also constitutes a violation of the plea agreement. The government also shall have the right (1)
9   to prosecute the defendant on any of the counts to which she pleaded guilty; (2) to reinstate any counts
10  that may be dismissed pursuant to this plea agreement; and (3) to file any new charges that would
11  otherwise be barred by this plea agreement. The defendant shall thereafter be subject to prosecution for
12  any federal criminal violation of which the government has knowledge. The decision to pursue any or
13  all of these options is solely in the discretion of the United States Attorney's Office.

14       By signing this plea agreement, the defendant agrees to waive any objections, motions, and
15  defenses that the defendant might have to the government's decision. Any prosecutions that are not
16  time-barred by the applicable statute of limitations as of the date of this plea agreement may be
17  commenced in accordance with this paragraph, notwithstanding the expiration of the statute of
18  limitations between the signing of this plea agreement and the commencement of any such prosecutions.
19  The defendant agrees not to raise any objections based on the passage of time with respect to such
20  counts including, but not limited to, any statutes of limitation or any objections based on the Speedy
21  Trial Act or the Speedy Trial Clause of the Sixth Amendment to any counts that were not time-barred as
22  of the date of this plea agreement. The determination of whether the defendant has violated the plea
23  agreement will be under a probable cause standard.

24       In addition, (1) all statements made by the defendant to the government or other designated law
25  enforcement agents, or any testimony given by the defendant before a grand jury or other tribunal,
26  whether before or after this plea agreement, shall be admissible in evidence in any criminal, civil, or
27  administrative proceedings hereafter brought against the defendant; and (2) the defendant shall assert no
28  claim under the United States Constitution, any statute, Rule 11(f) of the Federal Rules of Criminal

PLEA AGREEMENT          4

1  Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule, that statements made by

2  the defendant before or after this plea agreement, or any leads derived therefrom, should be suppressed.

3  By signing this plea agreement, the defendant waives any and all rights in the foregoing respects.

### F.  Forfeiture.

5       The defendant agrees to forfeit to the United States voluntarily and immediately all of her right

6  title and interest to any and all assets subject to forfeiture pursuant to 18 U.S.C. §§ 982(a) and 1029(c).

7  Those assets include, but are not limited to, the following:

     a.    Metro PCS/Huawei Model M931 cellular phone, black with a cracked screen, serial number: F4G29D1342417146;

     b.    Acer Chromebook computer, serial number: nxsheaa002416002597600;

     c.    Kyocera cellular phone, serial number: v65c5133;

     d.    Samsung cellular phone, serial number: r31d20evfde;

     e.    AT&T cellular phone, serial number: 327b414247a;

     f.    Samsung galaxy cellular phone, serial number: r38f206jr1e;

     g.    iPad tablet computer, serial number: dlxmq7mcfkl1;

     h.    Acer laptop computer, serial number: nxm2haa007236006e0160;

     i.    Dell laptop computer, serial number: 13661154469;

     j.    Epson printer, serial number: sn5y092386;

     k.    Samsung printer, serial number: zevpb8kf4c00qsf;

     l.    Credit card reader/writer MSR606 (serial number not visible);

     m.    iPhone cellular phone, model a1533, serial number: imei013988002936855;

     n.    Lenova computer, serial number cp22490519;

     o.    Asus computer, serial number: esn0bc225782227;

     p.    iPhone cellular phone, serial number: bcge2642a;

     q.    HP all in one personal computer, serial number: 3cr3430fd8;

     r.    Samsung tablet computer, serial number: r52f6022tdf;

PLEA AGREEMENT      5

s.   iPhone cellular phone, black, serial number: bcga1241;

t.   Acer computer, serial number: nxmnzaa0044200312b3400;

u.   iPad tablet computer, serial number: f4qmvb6zflmq;

v.   LG tablet znfv410;

w.   Samsung galaxy S5 cellular phone, serial number: r38f40yxmkr;

x.   Nokia phone, serial number 353045061498448;

y.   Samsung tablet computer, rf2f210rvry;

z.   Acer computer, serial number: nxmkeaa001416036ff7600;

aa.   HP laptop computer, serial number: cnu63326pn;

bb.   iPod touch device, serial number: ccqn3ac7fmjf;

cc.   iPod device, serial number: ccqmx2dxfmjf;

dd.   Lexmark printer/copier, serial number: 15450911645;

ee.   iPhone 4 cellular phone, white and cracked on front and back, with a white and pink case, serial number not recorded;

ff.   iPhone cellular phone with cracked back plate and Mophie battery pack, serial number not recorded;

gg.   Numerous credit cards, gift cards, access devices and financial and personal documents belonging to others and used in the scheme to defraud;

hh.   The value, i.e., balance of funds, in each of the seized pre-paid gift cards debit cards.

The defendant agrees that the listed assets constitutes property that are proceeds of, provided facilitation for, or that were involved in violations of 18 U.S.C. §§ 1029(b)(2), 1029(a)(2), 371, 1705, and/or 1708.

The defendant agrees to fully assist the government in the forfeiture of the listed assets and to take whatever steps are necessary to pass clear title to the United States. The defendant shall not sell, transfer, convey, or otherwise dispose of any of her assets, including but not limited to, the above-listed assets.

1        The defendant agrees not to file a claim to any of the listed property in any civil proceeding,
2 administrative or judicial, which may be initiated. The defendant agrees to waive her right to notice of
3 any forfeiture proceeding involving this property, and agrees to not file a claim or assist others in filing a
4 claim in that forfeiture proceeding.

5        The defendant knowingly and voluntarily waives her right to a jury trial on the forfeiture of
6 assets. The defendant knowingly and voluntarily waives all constitutional, legal and equitable defenses
7 to the forfeiture of these assets in any proceeding. The defendant agrees to waive any jeopardy defense,
8 and agrees to waive any claim or defense under the Eighth Amendment to the United States
9 Constitution, including any claim of excessive fine, to the forfeiture of the assets by the United States,
10 the State of California or its subdivisions.

11        The defendant waives oral pronouncement of forfeiture at the time of sentencing, and any
12 defenses or defects that may pertain to the forfeiture.

13    **G.    Asset Disclosure.**

14        The defendant agrees to make a full and complete disclosure of her assets and financial
15 condition, and will complete the United States Attorney's Office's "Authorization to Release
16 Information" and "Financial Affidavit" within five (5) weeks from the entry of the defendant's change
17 of plea, including supporting documentation. The defendant also agrees to have the Court enter an order
18 to that effect. The defendant understands that if she fails to complete truthfully and provide the
19 described documentation to the United States Attorney's office within the allotted time, she will be
20 considered in violation of the agreement, and the government shall be entitled to the remedies set forth
21 above in section II.E above.

22    **H.    Agreement to Cooperate**

23        The defendant agrees to cooperate fully with the government and any other federal, state, or local
24 law enforcement agency, as directed by the government. As used in this plea agreement, "cooperation"
25 requires the defendant: (1) to respond truthfully and completely to all questions, whether in interviews,
26 in correspondence, telephone conversations, before a grand jury, or at any trial or other court
27 proceeding; (2) to attend all meetings, grand jury sessions, trials, and other proceedings at which the
28 defendant's presence is requested by the government or compelled by subpoena or court order; (3) to

PLEA AGREEMENT           7

1  produce voluntarily any and all documents, records, or other tangible evidence requested by the

2  government; (4) not to participate in any criminal activity while cooperating with the government; and

3  (5) to disclose to the government the existence and status of all money, property, or assets, of any kind,

4  derived from or acquired as a result of, or used to facilitate the commission of, the defendant's illegal

5  activities or the illegal activities of any conspirators.

6              **III.    THE GOVERNMENT'S OBLIGATIONS**

7      **A.    Dismissals.**

8          The government agrees to move, at the time of sentencing, to dismiss without prejudice the

9  remaining counts in the pending Indictments.  The government also agrees not to reinstate any dismissed

10  count and not to bring any other charges arising from the conduct outlined in the Factual Basis attached

11  hereto as Exhibit A, except if this Agreement is voided as set forth herein, or as provided in paragraphs

12  II.E (Violation of Plea Agreement by Defendant/Withdrawal of Pleas), VI.B (Guidelines Calculations),

13  and VII.B (Waiver of Appeal and Collateral Attack) herein.

14      **B.    Recommendations.**

15          1.    Incarceration Range.

16          The government will recommend that the defendant be sentenced to the low end of the

17  applicable guideline range, as determined by the Court at sentencing.

18          2.    Acceptance of Responsibility.

19          The government will recommend a two-level reduction (if the offense level is less than 16) or a

20  three-level reduction (if the offense level reaches 16) in the computation of her offense level if the

21  defendant clearly demonstrates acceptance of responsibility for her conduct as defined in U.S.S.G. §

22  3E1.1.  This includes the defendant meeting with and assisting the probation officer in the preparation of

23  the pre-sentence report, being truthful and candid with the probation officer, and not otherwise engaging

24  in conduct that constitutes obstruction of justice within the meaning of U.S.S.G § 3C1.1, either in the

25  preparation of the pre-sentence report or during the sentencing proceeding.

26          3.    Reduction of Sentence for Cooperation.

27          The government agrees to recommend at the time of sentencing that the defendant's sentence of

28  imprisonment be reduced by up to 50% of the applicable guideline sentence if she provides substantial

PLEA AGREEMENT                          8

1  assistance to the government, pursuant to U.S.S.G. § 5K1.1.  The defendant understands that she must
2  comply with paragraph II.H (Agreement to Cooperate) and not violate this plea agreement, as set forth
3  in paragraph II.E (Defendant's Violation of Plea Agreement) herein.  The defendant understands that it
4  is within the sole and exclusive discretion of the government to determine whether the defendant has
5  provided substantial assistance.

6      The defendant understands that the government may recommend a reduction in her sentence of
7  less than 50% or no reduction at all, depending upon the level of assistance the government determines
8  that the defendant has provided.  The defendant further understands that a motion pursuant to U.S.S.G. §
9  5K1.1 is only a recommendation and is not binding on the Court, that this plea agreement confers no
10  right upon the defendant to require that the government make a § 5K1.1 motion, and that this plea
11  agreement confers no remedy upon the defendant in the event that the government declines to make a §
12  5K1.1 motion.  In particular, the defendant agrees not to try to file a motion to withdraw her guilty plea
13  based on the fact that the government decides not to recommend a sentence reduction or recommends a
14  sentence reduction less than the defendant thinks is appropriate.

15      If the government determines that the defendant has provided further cooperation within one
16  year following her sentencing, the government may move for a further reduction of her sentence
17  pursuant to Rule 35 of the Federal Rules of Criminal Procedure.

18      **C.    Use of Information for Sentencing.**

19      The government is free to provide full and accurate information to the Court and Probation,
20  including answering any inquiries made by the Court and/or Probation and rebutting any inaccurate
21  statements or arguments by the defendant, her attorney, Probation, or the Court.  The defendant also
22  understands and agrees that nothing in this Plea Agreement bars the government from defending on
23  appeal or collateral review any sentence that the Court may impose.

24                    **IV.    ELEMENTS OF THE OFFENSE**

25      At a trial, the government would have to prove beyond a reasonable doubt the following
26  elements of the offenses to which the defendant is pleading guilty.

27      **1.    Count One:  18 U.S.C. § 1029(b)(2) – Conspiracy to Commit Access Device Fraud**
        (as charged in Indictment, 15-CR-00176-TLN)
28

PLEA AGREEMENT                    9

1    Although *not* elements of Conspiracy to Commit Access Device Fraud, in violation of 18 U.S.C.

2  § 1029(b)(2), the elements of the *underlying* offense (Unauthorized Access Devices - Using or

3  Trafficking, in violation of 18 U.S.C. § 1029(a)(2)) are:

4    a.    First, the defendant knowingly used the unauthorized access devices at any time during a
             one-year period beginning on or about September 31, 2013, and ending September 31,
5             2014.

6    b.    Second, by using the unauthorized access devices during that period, the defendant
             obtained things of value, their value together totaling $1,000 or more, during that period;
7

8    c.    Third, the defendant acted with the intent to defraud; and

9    d.    Fourth, the defendant's conduct in some way affected commerce between one state and
             another state, or between a state of the United States and a foreign country.
10

11    Thus, to convict the defendant at trial on the charge of Conspiracy to Commit Access Device

12  Fraud, in violation of 18 U.S.C. § 1029(b)(2), the government would have to prove beyond a reasonable

13  doubt that:

14    a.    First, beginning in or about March 2014, and ending in or about September 2014, there
             was an agreement between two or more people to commit access device fraud as charged
15             in the indictment;

16    b.    Second, the defendant became a member of the conspiracy knowing of at least one of its
             objects and intending to help accomplish it; and
17

18    c.    Third, one of the members of the conspiracy performed at least one overt act for the
             purpose of carrying out the conspiracy.
19
       2.    **Count Five: 18 U.S.C. § 1708 – Theft of Mail Matter**
20             (as charged in Indictment, 15-CR-00242-TLN-SKO)

21    a.    First, there was mail at a post office in a letter box;

22    b.    Second, the defendant took the mail from the post office letter box; and

23    c.    Third, at the time the defendant took the mail, the defendant intended to deprive the
             owner, temporarily or permanently, of its use and benefit.
24

25    The defendant fully understands the nature and elements of the crimes charged in the Indictments

26  to which she is pleading guilty, together with the possible defenses thereto, and has discussed them with

27  her attorney.

28

PLEA AGREEMENT                                    10

1

## V.   MAXIMUM SENTENCE

2

### A.   Maximum Penalties.

3

### 1.   Count One:  18 U.S.C. § 1029(b)(2) – Conspiracy to Commit Access Device Fraud
(as charged in Indictment, 15-CR-00176-TLN)

4

5      The maximum sentence that the Court can impose on Count One is 5 years of incarceration, a

6   fine of $250,000, a 3-year period of supervised release and a special assessment of $100.  By signing

7   this plea agreement, the defendant also agrees that the Court can order the payment of restitution for the

8   full loss caused by the defendant's wrongful conduct.  The defendant agrees that the restitution order is

9   not restricted to the amounts alleged in the specific counts to which she is pleading guilty.  The

10   defendant further agrees, as noted above, that she will not attempt to discharge in any present or future

11   bankruptcy proceeding any restitution imposed by the Court.

12

### 2.   Count Five: 18 U.S.C. § 1708 – Theft of Mail Matter
(as charged in Indictment, 15-CR-00242-TLN-SKO)

13

14      The maximum sentence that the Court can impose on Count Four is 5 years of incarceration, a

15   fine of $250,000, a 3-year period of supervised release and a special assessment of $100.  By signing

16   this plea agreement, the defendant also agrees that the Court can order the payment of restitution for the

17   full loss caused by the defendant's wrongful conduct.  The defendant agrees that the restitution order is

18   not restricted to the amounts alleged in the specific counts to which she is pleading guilty.  The

19   defendant further agrees, as noted above, that she will not attempt to discharge in any present or future

20   bankruptcy proceeding any restitution imposed by the Court.

21

### B.   Violations of Supervised Release.

22      The defendant understands that if she violates a condition of supervised release at any time

23   during the term of supervised release, the Court may revoke the term of supervised release imposed on

24   each of Count One (as charged in as charged in Indictment 15-CR-00176-TLN) and Count Four (as

25   charged in Indictment, 15-CR-00242-TLN-SKO), and require the defendant to serve up to 2 additional

26   years of imprisonment.

27

28

1          VI.       **SENTENCING DETERMINATION**

2     **A.     Statutory Authority.**

3          The defendant understands that the Court must consult the Federal Sentencing Guidelines and

4     must take them into account when determining a final sentence.  The defendant understands that the

5     Court will determine a non-binding and advisory guideline sentencing range for this case pursuant to the

6     Sentencing Guidelines and must take them into account when determining a final sentence.  The

7     defendant further understands that the Court will consider whether there is a basis for departure from the

8     guideline sentencing range (either above or below the guideline sentencing range) because there exists

9     an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into

10    consideration by the Sentencing Commission in formulating the Guidelines.  The defendant further

11    understands that the Court, after consultation and consideration of the Sentencing Guidelines, must

12    impose a sentence that is reasonable in light of the factors set forth in 18 U.S.C. § 3553(a).

13    **B.     Stipulated Guideline Calculation.**

14         The government and the defendant agree that there is no material dispute as to the following

15    sentencing guidelines variables and therefore stipulate to the following:

16    **1.   Count One: 18 U.S.C. § 1029(b)(2) – Conspiracy to Commit Access Device Fraud**
           (as charged in Indictment, 15-CR-00176-TLN)

17

18         **A.   Base Offense Level**: The base offense level for the charge to which the defendant is
                pleading guilty is **6**.  See U.S.S.G. § 2B1.1(a)(2).

19

      **B.  Specific Offense Characteristics:**

20

                a.   Ten levels are added **(+10)** because the loss in this case was more than $150,000
21                   but less than $250,000.  Id. at (b)(1)(F).

22              b.   Two levels are added **(+2)** because the offense involved 10 or more victims.  Id.
23                   at (b)(2)(A).

24              c.   Two levels are added **(+2)** because the offense involved: (A) the possession or
                    use of: (i) device-making equipment, (ii) authentication features; (B) the
25                   production or trafficking of: (i) unauthorized access devices or counterfeit
                    access devices; and (C)(i) the unauthorized transfer or use of any means of
26                   identification unlawfully to produce or obtain any other means of identification,
                    and (ii) the possession of 5 or more means of identification that unlawfully were
27                   produced from, or obtained by the use of, another means of identification.  Id. at
                    (b)(11)(A) – (C).
28

PLEA AGREEMENT                          12

**C. Adjusted Offense Level:** Given the stipulations above, the parties estimate that the adjusted offense level will be **20**.

2. <u>**Count Five: 18 U.S.C. § 1708 – Theft of Mail Matter**</u>
   (as charged in Indictment, 15-CR-00242-TLN-SKO)

    **A. Base Offense Level**: The base offense level for the charge to which the defendant is pleading guilty is **6**. <u>See</u> U.S.S.G. § 2B1.1(a)(2).

    **B. Specific Offense Characteristics:**

        a.  Two levels are added **(+2)** because the offense involved 10 or more victims. <u>Id.</u> at (b)(2)(A).

    **C. Adjusted Offense Level:** Given the stipulations above, the parties estimate that the adjusted offense level will be **8**.

    **D. Grouping Multiple Counts**:

        i.  The Counts in the Indictments to which the defendant is pleading guilty may be grouped together under U.S.S.G. § 3D1.2(a)-(c).

        ii. The offense level applicable to the grouped Counts is **20**, which is the offense level applicable under Chapter Two and Parts A, B, and C of Chapter Three of the Sentencing Guidelines, for the most serious of the Counts comprising the group, i.e., the highest offense level of the Counts in the group. <u>See</u> U.S.S.G. § 3D1.3(a).

    **E. Additional Chapter Three Adjustments**:

    a.  <u>Acceptance of Responsibility</u>: See Part III.B.2 above.

    **D. Adjusted Offense Level:** Given the stipulations above, the parties anticipate that the adjusted offense level will be **17**.

    **E. Criminal History:** The parties agree and stipulate that the applicable criminal history will be determined by the Court's probation officers. The parties estimate, but do not stipulate, that the defendant's criminal history category will likely be no less than II, and that the Sentencing Guideline range will be **27 to 33** months. The defendant understands that if the criminal history category differs from the parties' estimate, her Guidelines sentencing range may differ from that set forth here.

    **F. Departures or Other Enhancements or Reductions:** The parties agree that they will not seek or argue in support of any other specific offense characteristics, Chapter Three adjustments (other than the decrease for "Acceptance of Responsibility"), or cross-references, except that the government may move for a departure or an adjustment based on the defendant's post-plea obstruction

of justice (§3C1.1). Both parties agree not to move for, or argue in support of, any departure from the Sentencing Guidelines, or any deviance or variance from the Sentencing Guidelines under United States v. Booker, 543 U.S. 220, 125 S.Ct. 738 (2005).

The defendant is free to recommend to the Court whatever sentence she believes is appropriate under 18 U.S.C. § 3553(a). The government may oppose the defendant's sentencing arguments.

## VII.    WAIVERS

### A.    Waiver of Constitutional Rights.

The defendant understands that by pleading guilty she is waiving the following constitutional rights: (a) to plead not guilty and to persist in that plea if already made; (b) to be tried by a jury; (c) to be assisted at trial by an attorney, who would be appointed if necessary; (d) to subpoena witnesses to testify on her behalf; (e) to confront and cross-examine witnesses against her; and (f) not to be compelled to incriminate herself.

### B.    Waiver of Appeal and Collateral Attack.

The defendant understands that the law gives the defendant a right to appeal her guilty pleas, conviction, and sentence. The defendant agrees as part of her pleas, however, to give up the right to appeal the guilty pleas, convictions, and the sentence imposed in these cases as long as the sentence does not exceed the statutory maximums for the offenses to which she is pleading guilty. The defendant specifically gives up the right to appeal any order of restitution the Court may impose.

Notwithstanding the defendant's waiver of appeal, the defendant will retain the right to appeal if one of the following circumstances occurs: (1) the sentence imposed by the District Court exceeds the statutory maximum; and/or (2) the government appeals the sentence in the case. The defendant understands that these circumstances occur infrequently and that in almost all cases this Agreement constitutes a complete waiver of all appellate rights.

In addition, regardless of the sentence the defendant receives, the defendant also gives up any right to bring a collateral attack, including a motion under 28 U.S.C. § 2255 or § 2241, challenging any aspect of the guilty plea, conviction, or sentence, except for non-waivable claims.

Notwithstanding the government's agreements in paragraph II.A above, if the defendant ever attempts to vacate her pleas, dismiss the underlying charges, or modify or set aside her sentence on any

PLEA AGREEMENT                                    14

1   of the counts to which she is pleading guilty, the government shall have the rights set forth in Section

2   II.E of this agreement.

3         **C.**     **Waiver of Attorneys' Fees and Costs.**

4         The defendant agrees to waive all rights under the "Hyde Amendment," Section 617, P.L. 105-

5   119 (Nov. 26, 1997), to recover attorneys' fees or other litigation expenses in connection with the

6   investigation and prosecution of all charges in the above-captioned matter and of any related allegations

7   (including without limitation any charges to be dismissed pursuant to this plea agreement and any

8   charges previously dismissed).

9         **D.**     **Impact of Plea on Defendant's Immigration Status.**

10        Defendant recognizes that pleading guilty may have consequences with respect to her

11  immigration status if she is not a citizen of the United States.  Under federal law, a broad range of

12  crimes are removable offenses, including offenses to which the defendant is pleading guilty.  The

13  defendant and her counsel have discussed the fact that the charge to which the defendant is pleading

14  guilty is an aggravated felony, or a crime that is likely to be determined to be an aggravated felony under

15  8 USC § 1101(a)(43), and that while there may be arguments that defendant can raise in immigration

16  proceedings to avoid or delay removal, it is virtually certain that defendant will be removed.  Removal

17  and other immigration consequences are the subject of a separate proceeding, however, and defendant

18  understands that no one, including her attorney or the district court, can predict to a certainty the effect

19  of her conviction on her immigration status.  Defendant nevertheless affirms that she wants to plead

20  guilty regardless of any immigration consequences that her plea may entail, even if the consequence is

21  her automatic removal from the United States.

22        **VIII.**     **ENTIRE PLEA AGREEMENT**

23        Other than this plea agreement, no agreement, understanding, promise, or condition between the

24  government and the defendant exists, nor will such agreement, understanding, promise, or condition

25  exist unless it is committed to writing and signed by the defendant, counsel for the defendant, and

26  counsel for the United States.

27  ///

28  ///

1

## IX.     APPROVALS AND SIGNATURES

2

### A.     Defense Counsel.

3      I have read this plea agreement and have discussed it fully with my client.  The plea agreement
4   accurately and completely sets forth the entirety of the agreement.  I concur in my client's decision to
5   plead guilty as set forth in this plea agreement.

6   Dated:  3/ 30 /7

7                                                        _____
                                                         MICHAEL B. BIGELOW, attorney for
                                                         Defendant
8

### B.     Defendant:

9
10      I have read this plea agreement and carefully reviewed every part of it with my attorney.  I
    understand it, and I voluntarily agree to it.  Further, I have consulted with my attorney and fully
11
    understand my rights with respect to the provisions of the Sentencing Guidelines that may apply to my
12
    case.  No other promises or inducements have been made to me, other than those contained in this plea
13
    agreement.  In addition, no one has threatened or forced me in any way to enter into this plea agreement.
14
    Finally, I am satisfied with the representation of my attorney in this case.
15
    Dated:                                              _____
16
                                                         MEGHAN PARADIS
17                                                       Defendant

18

### C.     Attorney for United States:

19      I accept and agree to this plea agreement on behalf of the government.

20   Dated:   3/ 30 /7
                                                         PHILLIP A. TALBERT
21                                                       Acting United States Attorney

22                                                       _____

23                                                       ANDRÉ M. ESPINOSA
                                                         Assistant United States Attorney
24

25

26

27

28

PLEA AGREEMENT                              16

EXHIBIT "A"
Factual Basis for Plea(s)

**Background**

Between March 2014 and September 2014, defendant Meghan Paradis ("PARADIS") and eight co-conspirators operated a scheme to make, use, and traffic in unauthorized access devices, primarily, Target REDcard credit card account numbers, which they used to purchase merchandise and pre-prepaid credit cards at Target stores throughout the Eastern District of California, and elsewhere. In many instances, PARADIS and her co-conspirators returned some or all of the pre-paid credit cards they purchased to the leader of the conspiracy, B.K., in exchange for more fraudulent Target REDcard credit card account numbers, which they used to purchase more merchandise. Six of the nine co-conspirators were roommates in two houses in Stockton: a residence on Princess Drive, where B.K. lived with co-conspirators A.C. and S.S. (the "Princess House"); and a residence on Portola Court, where co-conspirators T.V., S.V., and J.B., lived ("the Portola House). PARADIS and co-conspirator V.T. lived together in Stockton. A final co-conspirator, D.S., also resided in Stockton. All nine conspirators know each other and some were in relationships together.[1]

**Facts Establishing the Conspiracy Charged in Count One of Indictment, 15-CR-00176-TLN**

PARADIS and her co-conspirators fraudulently acquired valid REDcard account numbers by stealing victims' personal identification information and using it to complete and submit electronic applications to open REDcard accounts. Once they possessed those valid but fraudulently obtained REDcard account numbers, PARADIS and her co-conspirators acquired additional valid REDcard account numbers by entering the earlier acquired account numbers into a computer program that predicted and generated a list of potential REDcard account numbers. PARADIS and her co-conspirators then used those account numbers, credit card device making equipment, and blank or altered cards with magnetic stripes to make fraudulent REDcards with magnetic stripes encoded with authentic Target REDcard account numbers. To avoid detection at the point of sale, PARADIS and her co-conspirators encoded the magnetic stripes of the fraudulent REDcards they created with false account holder names, including their own names, aliases, or other placeholders.

---

[1] PARADIS and V.T. were a couple, have a child together, and resided at V.T.'s mom's house for certain periods during the conspiracy. PARADIS and B.K. were once close but had a falling out. V.T. has a child with X.M., who resided at the Princess House during the conspiracy but who was not charged as a co-conspirator. V.T. often visited the Princess House to see his child. T.V. and J.B. were a couple and have a child together. T.V. has known B.K. since childhood. B.K. was also once close to J.B. but their relationship cooled. S.V. and J.B. are half-sisters. S.S. and D.S. are long-term friends.

Defendant's Initials

1    PARADIS and her co-conspirators traveled to Target stores individually or in small groups to
2  make fraudulent purchases. In some cases, PARADIS and her co-conspirators used fraudulent
3  REDcards at the same stores within minutes of one another – sometimes using the same registers – and
4  exited those stores together or separately within minutes of one another. To test whether a fraudulent
5  REDcard would be accepted at the point of sale, PARADIS and her co-conspirators conducted test-
   purchases of low-cost merchandise. If the fraudulent REDcard was accepted, PARADIS and her co-
6  conspirators used it again in the same and other Target stores to make more expensive purchases.

7    PARADIS and her co-conspirators created and trafficked in fraudulent REDcards in the Princess
8  House and the Portola House, where they stored dozens of unauthorized access devices, including
9  REDcard account numbers and a variety of cards with magnetic stripes, including cards that were in the
10 process of being converted into unauthorized access devices. PARADIS and her co-conspirators also
   possessed stolen mail, device-making equipment, receipts from fraudulent purchases, and merchandise
11 obtained during the conspiracy at the Princess and Portola Houses. PARADIS and her co-conspirators
12 also maintained a collection of victims' identification information at the Princess and Portola Houses,
13 including earning statements, credit reports, driver licenses, Department of Motor Vehicle documents,
14 Social Security numbers, Internal Revenue Service filings, and credit, debit, and bank account data.

15    Between March 2014 and September 2014, PARADIS and her co-conspirators completed
16 hundreds of successful transactions using fraudulent REDcards. During the conspiracy, PARADIS
17 personally conducted approximately thirty-two known fraudulent transactions, using cards encoded with
   account information of at least fifteen victims, and at least two different cards encoded with her own
18 name. In all, over 300 unauthorized access devices were possessed, used, procured, or trafficked by
19 members of the conspiracy in furtherance of the conspiracy. Over approximately 1,000 victims were
20 identified as having had their identities compromised as a result of the conspiracy.

21                    **Overt Acts by PARADIS and Other Conspirators**

22    On or about March 19, 2014, at approximately 7:07pm, at Target store number 853 in Lodi,
23 conspirator B.K. used an unauthorized access device in the form of REDcard account number
   xxxxxx8962, belonging to victim P.Y., to make a test purchase in the amount of approximately $3.07.
24 On the same date, at approximately 7:16pm, B.K. used the used the same unauthorized access device in
25 the same store to make purchases totaling approximately $256.49. The name encoded on the magnetic
26 stripe of the access device B.K. used during that transaction was his alias, "Rap Chameroun."[2]

27

28   [2] Approximately nine fraudulent transactions were completed during the conspiracy using unauthorized access devices

PLEA AGREEMENT                              A-2
                                                      Defendant's Initials _____

On or about March 23, 2014, at approximately 4:33pm, at Target store 1526 in Manteca, co-conspirator S.V. used an unauthorized access device in the form of REDcard account number xxxxxx5656, belonging to victim R.G., to make a test purchase in the amount of approximately $1.75. On the same date, at approximately 5:39pm, S.V. used the same unauthorized access device in the same Target store to make purchases totaling approximately $474.12.  After completing those purchases, S.V. exited that Target store with conspirator B.K.  The name encoded on the magnetic stripe of the access device S.V. used that day was the name of conspirator A.C.

On or about March 25, 2014, at approximately 9:49am, at Target store 2270 in El Dorado Hills, PARADIS used an unauthorized access device in the form of REDcard account number xxxxxx7222, belonging to victim M.T., to make purchases totaling approximately $422.74.  During the transaction, conspirator V.T. stood at the register with PARADIS, and the two exited that Target store together.  The name programmed on the magnetic stripe of the access device PARADIS used that day was PARADIS' name.  Later that day, at approximately 9:57am, at the same Target store, V.T. used an unauthorized access device in the form of REDcard account number xxxxxx7222, belonging to victim M.T., to make purchases totaling approximately $247.72.  The magnetic stripe of the access device V.T. used that day was programmed with PARADIS' name.

On or about March 27, 2014, at approximately 8:13am, at Target store number 938 in Modesto, an unauthorized access device in the form of REDcard account number xxxxxx6633, belonging to victim S.G., was used to make a test purchase in the amount of approximately $4.15.  On the same date, at approximately 8:27am, conspirator B.K. used the same unauthorized access device in the same Target store to make purchases totaling approximately $331.66.  The name encoded on the magnetic stripe of the access device B.K. used during that transaction was the name of B.K.  Moments later, at approximately 8:16am, at the same Target store, conspirator A.C. used an unauthorized access device in the form of REDcard account number xxxxxx8855, belonging to victim S.C., to make a test purchase in the amount of approximately $5.16.  Thereafter, at approximately 8:37am, A.C. used the same unauthorized access device in the same Target store to make purchases totaling approximately $305.38. The name encoded on the magnetic stripe of the access device A.C. used that day was "Amber Cunningham."  On the same date, almost one hour later at approximately 9:18am, A.C. used the same unauthorized access device at Target store number 273, also in Modesto to make purchases totaling

encoded with the name "Rap Chameroun" - eight by conspirator B.K. and one by conspirator J.B.  In December 2013, police recovered a CA driver's license from B.K. with his photo but the name Rap Chameroun.

Defendant's Initials

approximately $471.49. At approximately the same time that day, at the same Target store in Modesto, conspirator B.K. used an unauthorized access device in the form of REDcard account number xxxxxx8989, belonging to victim N.J., to make purchases totaling approximately $481.82. The name encoded on the magnetic stripe of the access device B.K. used during that transaction was "Dalee Chameroun."

On or about April 1, 2014, at approximately 3:23pm, at Target store number 1862 in Stockton, conspirator B.K. used an unauthorized access device in the form of REDcard account number xxxxxx8282, belonging to victim D.S., to make purchases totaling approximately $718.97. The name encoded on the magnetic stripe of the access device B.K. used that day was "Bryan Oum."[3]

On or about May 23, 2014, at approximately 7:37pm, at Target store number 1862 in Stockton, conspirator D.S. used an unauthorized access device in the form of REDcard account number xxxxxx7710, belonging to victim K.P., to make purchases totaling approximately $414.23. The name encoded on the magnetic stripe of the access device D.S. used that day was "Sysen Donna."

On or about June 26, 2014, at approximately 5:04pm, at Target store number 853 in Lodi, conspirator T.V. used an unauthorized access device in the form of REDcard account number xxxxxx3774, belonging to victim L.Z., to make purchases totaling approximately $66.78. The name programmed on the magnetic stripe of the access device T.V. used that day was conspirators V.T.'s name. On the same day, one minute later, at the same Target store, V.T. used an unauthorized access device in the form of REDcard account number xxxxxx8377, belonging to victim S.H., to make purchases totaling approximately $145.99. The name programmed on the magnetic stripe of the access device V.T. used that day was V.T.'s name in reverse. Also the same day, at approximately 5:14pm, at the same Target store, PARADIS used an unauthorized access device in the form of REDcard account number xxxxxx8431, belonging to victim P.P., to make purchases totaling approximately $173.17.

On or about July 10, 2014, between at approximately 10:01pm and 10:04pm, at Target store 853 in Lodi, conspirator S.V. used an unauthorized access device in the form of REDcard account number xxxxxx5557, belonging to victim P.C., to make three successive purchases totaling approximately $345.07. During the purchases, conspirator D.S. stood at the register with S.V. and they exited together.

On or about July 18, 2014, between approximately 2:43pm and approximately 7:27pm, at two separate Target stores in Dublin, California, stores 2771 and 328, conspirator J.B. used five different

---

[3] The name "Bryan Oum" was also encoded on an unauthorized access device used in at least eight other transactions, including transactions completed by PARADIS.

PLEA AGREEMENT                                         A-4

Defendant's Initials

1   unauthorized access devices in the form of REDcard account numbers, xxxxxx9223, xxxxxx9614,

2   xxxxxx3322, xxxxxx5514, and xxxxxx3551, belonging, respectively, to victims A.C., K.S., W.A., A.O,

3   and D.G., for purchases totaling approximately $438.  During purchases that occurred at approximately

4   5:51pm, at Target store 2771, conspirator T.V. stood at the register with J.B., and the two exited both

5   Target stores together.[4]

6        On or about July 28, 2014, at approximately 3:09pm, at Target store 853 in Lodi, conspirator

7   A.C. used an unauthorized access device in the form of REDcard account number xxxxxx0156,

8   belonging to victim M.F., to make purchases in the amount of approximately $487.03.  The name

9   programmed on the magnetic stripe of the access device A.C. used that day was "Misty Mcafee," an

    alias used by A.C.[5]

10        On or about August 8, 2014, at approximately 2:08pm, at Target store 626 in San Jose,

11  conspirator S.V. used an unauthorized access device in the form of REDcard account number

12  xxxxxx1937, belonging to victim G.G., to make purchases in the amount of approximately $420.36.

13  The next day, August 9, 2014, at approximately 6:36pm, at Target store number 2347 in Lathrop,

14  conspirator S.S. used an unauthorized access device in the form of REDcard account number

15  xxxxxx0342, belonging to victim J.S., to make purchases totaling approximately $566.93.  During the

16  transaction, conspirator D.S. stood at the register with S.S. and attempted to pay for the transaction by

17  swiping a card that was declined.  Thereafter, S.S. completed the transaction and the two exited that

    Target store together.

18        On or about August 24, 2014, conspirator S.S. (who resided at the Princess House at the time),

19  sent to conspirator S.V. (who resided at the Portola House at the time) two text messages to which were

    attached two separate photographs of collections of dozens of REDcard account numbers.

20                              **Searches of the Princess and Portola Houses**

21        On or about August 28, 2014, investigators searched the Princess and Portola Houses.  Evidence

22      [4] On July 14, 2014, PARADIS and conspirators V.T., T.V., and S.V. each made at least one fraudulent purchase at the
23  same Target in Tracy, within two hours of one another. The following day, T.V. and S.S. were together making fraudulent
    transactions in the same store, and at stores in San Jose and Livermore. On July 27, 2014, T.V. and J.B. used three different
24  cards to make purchases at the same Target store in Tracy within minutes of one another.

        [5] In November 2014, investigators discovered A.C. and others squatting in an empty house in Stockton. During a parole
25  search of the bedroom in which a parolee was found, investigators found a purse that A.C. denied ownership over and that
    contained a California driver's license with a photo of A.C. but in the name "Misty Mcafee," and that listed an address
26  investigators confirmed belonged to the real Mcafee. The purse also contained personal identification information for
    approximately fifty victims, numerous Target gift cards, and various Target receipts. Approximately 20 fraudulent
27  transactions were completed during the conspiracy using unauthorized access devices encoded with the name "Misty
    Mcafee," including three cards linked to separate account numbers used by A.C.

28  PLEA AGREEMENT                          A-5
                                                                    Defendant's Initials _____

found in conspirator B.K.'s vehicle and in a room B.K. shared with conspirator S.S. included a fake CA driver's license with B.K.'s photo and the alias "Phirun Kien;"[6] pages of victim identification information; victims' mail, bank, and tax records; receipts from various Target transactions; credit cards in various phases of modification to appear like REDcards; pages of REDcard account numbers; an MSR 606 credit card reader/writer; prepaid gift cards purchased during fraudulent transactions completed with unauthorized REDcard accounts; and unauthorized access devices in the form of credit cards with magnetic stripes encoded with valid REDcard account numbers associated with victims.[7]

The search of the Portola House also yielded evidence of the conspiracy in conspirator S.V.'s room, the garage of the house, and inside a Cadillac controlled by S.V. Evidence in S.V.'s room and Cadillac included a receipt for a fraudulent transaction conducted on August 8, 2014, at a Target store in San Jose, using an unauthorized REDcard to purchase $420.00 worth of goods, as set forth above. In the garage, investigators found clear laminate overlays with account numbers and names (to be placed on a credit card altered to look like a REDcard), and a composition book containing pages of lists of four digit numbers associated with Target credit card numbers. That composition book is titled: "Property of Miss [B]" (the last name of conspirator J.B.). Also in the garage, agents recovered victim identification information, bank and tax records, and prepaid gift cards (some of which were purchased with unauthorized Target REDcard accounts during the conspiracy). Agents also seized conspirator S.V.'s cell phone, which contained text messages that revealed a discussion with conspirators S.S. and T.V. acknowledging the conspiracy, exchanging requests for "cards," and discussing shopping excursions to Target stores. S.V. also communicated by text message with conspirator D.S. about the conspiracy.

### Witness Statement

X.M. resided at the Princess Home and rented a room to B.K. X.M. knew B.K. learned how to generate Target REDcard account numbers but she did not know how he did it. B.K. taught others how to make cards using a read/writer but those others had to return to B.K. because only he knew how to

---

[6] The alias "Phirun Kien" was encoded on the magnetic stripes of several unauthorized access devices used by B.K. and others during the conspiracy, including on a card used by conspirators D.S. and S.S. on August 21, 2014, at a Target in Lathrop. B.K. and conspirators T.V., S.V., and D.S. also used a total of ten different fraudulent cards encoded with the name "Keone Millare," which is not the name of the victim account holder for any of the account numbers encoded on the fraudulent cards. Similarly, conspirators D.S. and S.V. each used different cards encoded with the name "Jackie Johnson." Approximately thirty-three fraudulent transactions were completed during the conspiracy using unauthorized access devices encoded with the names of five of the conspirators: PARADIS, V.T., B.K., A.C., and J.B. The majority of unauthorized access devices used to make fraudulent purchases were encoded with generic terms like: "Customer Valued."

[7] This included approximately 17 cards encoded with account information that was actually used in earlier fraudulent transactions and approximately 67 other cards encoded with account information not used in successful transactions.

Defendant's Initials

1   generate account numbers and only he possessed a reader/writer. X.M. identified all nine charged

2   conspirators, and others, by name, as members of B.K.'s "entourage," and as people to whom B.K. gave

3   fraudulent access devices at the Princess Home. X.M. observed B.K. possess lists of Target credit card

4   numbers and observed B.K. submit a fraudulent application for a Target REDcard.

### Confessions by Certain Conspirators

5       On or about April 1, 2014, as set forth above, Target investigators observed conspirator B.K. use

6   a counterfeit Target credit card to make purchases totaling approximately $718.97, at a Target store in

7   Stockton, and detained B.K. During a subsequent interview, B.K. admitted he held a degree in

8   Computer Science and that he had figured out Target's credit card sequencing system, which had

9   allowed B.K. to create counterfeit credit cards using a credit card reader/writer. B.K. stated he was the

10  only one who knew how to manufacture the counterfeit cards and that he recruited other people to use
    the cards and increase the scope of his operation.

11      On or about July 30, 2014, Target investigators observed conspirator T.V. use a counterfeit

12  Target credit card to purchase prepaid gift cards and various grocery items at a Target store in Stockton,

13  and detained V.T. During a subsequent interview, T.V. admitted that he received the counterfeit credit

14  card from B.K., and identified B.K. from a photograph, and stated he was aware that Target had

15  detained B.K. in the past for using fraudulent Target credit cards. T.V. stated in exchange for using the

16  fraudulent Target credit card B.K. gave him, T.V. was to purchase prepaid gift cards while using the

    cards and give the pre-paid gift cards to B.K. T.V. stated he planned to meet with B.K. after T.V.

17  completed his purchases at Target that day, and identified the Princess House on a map.

18      T.V. also stated that he was dating conspirator J.B. and that they both lived at the Portola House,

19  along with conspirator S.V. T.V. identified B.K. as the leader of the credit card fraud scheme, and also

20  identified PARADIS and co-conspirators, V.T., S.S., and D.S. T.V. told investigators that PARADIS,

21  V.T., S.S., and D.S. all received counterfeit Target cards from B.K.

22      In September 2014, investigators interviewed conspirator D.S., who admitted receiving

23  unauthorized access devices from B.K. D.S. stated B.K. warned D.S. that some of the cards might not

    work and if D.S. was asked for identification by a clerk, D.S. should deny having any. D.S. stated she

24  used unauthorized access devices at Target stores in Stockton and agreed she also used them in Tracy,

25  Modesto, Lathrop, Lodi, San Jose, and Manteca. D.S. also identified herself in seven surveillance

26  photos from transactions in which D.S. used unauthorized access devices (and D.S. identified

27  conspirator S.S. as a long-time friend, in a photos related to an August 9, 2014 fraudulent transaction).

28  PLEA AGREEMENT                          A-7
                                                           Defendant's Initials

1  D.S. stated she used the unauthorized access devices because she is a girl and liked to buy things.

2  PARADIS agrees that: (A) fraudulent transactions made during the conspiracy exceeded $1,000
3  in aggregate value; (B) were completed in one calendar year; and (C) if this matter proceeded trial, the
4  government would present proof beyond a reasonable doubt that PARADIS and her co-conspirators
   made those fraudulent transactions including:  (i) video footage and photographs of PARADIS and her
5  co-conspirators swiping unauthorized access device at registers and exiting Target stores on the dates of
6  the charged transactions, within minutes of those transactions; (ii) receipts from the fraudulent purchases
7  showing the dates and times of the fraudulent purchases, and information concerning the unauthorized
8  access device used; and (iii) victims' statements confirming that use of the victims' account information
9  by PARADIS and her co-conspirators was unauthorized.  PARADIS also agrees that each fraudulent
   transaction triggered a bank transaction that moved in and affected interstate commerce.
10
   **Facts Establishing Count Four of Indictment, 15-CR-00242-TLN-SKO**
11
   Between June 2012 and May 2014, PARADIS and V.T. (who was also charged with theft of
12  mail and other crimes in Indictment, 15-CR-00242-TLN-SKO, and who was charged in the credit card
13  fraud conspiracy with which PARADIS was charged in Indictment, 15-CR-00176-TLN), entered post
14  offices in Acampo, California; Clements, California; Wallace, California; and Burson, California.  After
15  doing so, PARADIS and V.T. destroyed and broke open post office boxes stole mail from inside them.
16  PARADIS and V.T. took checks from certain of the mail boxes they broke into and deposited those
   checks into accounts they controlled.
17
   On or about April 11, 2013, approximately ten post office boxes the Clements Post Office, in
18  Clements, California, were compromised by vandalism and mail was stolen from those post office
19  boxes.  Covert cameras in the facility recorded images of PARADIS and V.T. forcing open those post
20  office boxes and stealing mail from inside them.  The vandalism resulted in losses of approximately
21  $1,500, and more than ten victims were affected by the offense.

22  *I have read and carefully reviewed the Factual Basis for Plea with my attorney. I agree that as it concerns my*
   *conduct, it is correct. I also agree that if this matter proceeded to trial, the United States could establish each of the facts*
23  *contained within the Factual Basis for Plea beyond a reasonable doubt, and that those facts satisfy the elements of the*
   *offenses to which I am pleading guilty.*
24
25  Dated: _____                    _____
                                                          MEGHAN PARADIS
26                                                        Defendant

27

28  PLEA AGREEMENT                                A-8

                                                          Defendant's Initials _____